# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

* * * * * * * * * * * * * * * * * * * * * * * * *
ROBIN MORRISON, * No. 22-609V
*
Petitioner, *
* Special Master Christian J. Moran
v. *
* Filed: September 14, 2026
SECRETARY OF HEALTH *
AND HUMAN SERVICES, *
*
Respondent. *
* * * * * * * * * * * * * * * * * * * * * * * * *

Sean Franks Greenwood, The Greenwood Law Firm, Houston, TX, for petitioner;
Madylan Louise Yarc, United States Dep't of Justice, Washington, D.C., for respondent.

**PUBLISHED DECISION DENYING ATTORNEYS' FEES AND COSTS[1]**

Petitioner, Robin Morrison, sought compensation through the Vaccine Program. 42 U.S.C. § 300aa-10 through 34. Through an amended petition, Ms. Morrison claimed that a varicella vaccine caused her to suffer systemic lupus erythematosus. Ms. Morrison did not receive compensation. However, as the Vaccine Act allows, Ms. Morrison requests an award of attorneys' fees and costs. The Secretary argues that Ms. Morrison does not qualify for a discretionary award of attorneys' fees and costs because she has not established a prerequisite, namely, she failed to establish that her claims were supported by reasonable basis.

The Secretary's opposition is well-founded. Ms. Morrison has not carried her burden to show that reasonable basis supported her claim that she suffered from lupus. Ms. Morrison's claim is contradicted by reports from her treating rheumatologist, who stated that she did not fulfill the diagnostic criteria for lupus. Thus, the evidence weighs against a finding that Ms.

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

Morrison's claim was supported by reasonable basis. Without this showing, she cannot be awarded attorneys' fees and costs.

## I. Events in Ms. Morrison's Life[2]

### A. Before Vaccination and Vaccination

Ms. Morrison was born in 1963. Exhibit 1 (Ms. Morrison's affidavit) ¶ 1. Before the allegedly causal vaccination, she was considered to be pre-diabetic. Exhibit 20 at 10, 105-16, 122-31, 157-71; Exhibit 6 at 6. In 2019, based upon complaints of chronic lethargy and diffuse joint pains, a rheumatologist evaluated her for rheumatoid arthritis but did not make that diagnosis. Exhibit 20 at 199-230, 248-64.

In 2019, Texas Children's Hospital was interested in hiring Ms. Morrison. As part of this process, a test revealed that she had not been immunized against chicken pox. So, her future employer required her to receive the varicella vaccine. Exhibit 1 ¶ 2-3.[3] Ms. Morrison received the varicella vaccine on June 3, 2019. Exhibit 2 (Individual Immunization Compliance Report).

### B. Initial Symptoms and Out-Patient Care

About two weeks after vaccination, Ms. Morrison sought care from Excel Urgent Care. Exhibit 12 at 11 (June 18, 2019). She complained about left arm pain and swelling, which started on June 12, 2019. The doctor noted a single pustule on petitioner's left arm surrounded by an area of erythema, that was "hard, hot and tender to [the] touch." Id. The doctor diagnosed Ms. Morrison with cellulitis and prescribed antibiotics.

Although the sequence is not entirely clear, it appears that Ms. Morrison informed her employer that the varicella vaccine caused her to develop chicken pox. See Exhibit 19-2 at 116 (first report of injury, dated June 19, 2019, stating she was diagnosed with chicken pox on June 20, 2019). This claim for workers' compensation benefits led Ms. Morrison to being directed to see a designated doctor, Steve Schierman. Id. at 119-20 (also stating the employer and insurance carrier were accepting the claim for varicella without complication).

Dr. Schierman saw Ms. Morrison on June 20, 2019. Ms. Morrison complained about a rash that had spread over her body. Dr. Schierman, in turn, noted the presence of a rash with pruritic vesicles. He diagnosed her as having varicella without complication. He also noted that "varicella post vaccination is an unusual occurrence." Exhibit 3 at 14.

### C. First Sugar Land Hospitalization: June 24, 2019 to July 2, 2019

On June 24, 2019, Ms. Morrison sought care at the emergency department of Houston Methodist Sugar Land Hospital ("Sugar Land Hospital") complaining of fever, myalgias, itching,

---

[2] A thorough summary of the medical records is found in the Secretary's report, filed on March 27, 2024. For a shorter account, see Pet'r's Mot. for an Award of Attorneys' Fees and Costs on an Interim Basis, filed Mar. 14, 2024, at ¶¶ 9-39.

[3] Another term for "chicken pox" is "varicella." See Dorland's Illus. Med. Dict. 337 (33rd ed.). Chicken pox (or varicella) is an infectious disease caused by human herpesvirus 3. Id.

rash, pruritus, and headaches. Exhibit 9 at 445. She was diagnosed with varicella with complications and skin rash. Id. Ms. Morrison was admitted that same day. Id. at 439-40.

Part of her treatment was acyclovir.[4] After improving, Ms. Morrison was discharged on July 2, 2019. Exhibit 9 at 488.

About three weeks later, she returned to Dr. Schierman.[5] She complained about generalized weakness, which was improving. Dr. Schierman stated that her rash was resolving. Exhibit 3 at 16.

### D. Second Sugar Land Hospitalization: August 2, 2019 to August 3, 2019

Ms. Morrison returned to the Sugar Land Hospital's emergency department on August 2, 2019. She was complaining about chest pain. Extensive testing did not show any significant problems. She was discharged on August 3, 2019. Exhibit 9 at 245.

### E. Outpatient Fall 2019 to Early 2020

Ms. Morrison saw Dr. Schierman twice in August 2019, complaining about fatigue and swelling. In the earlier appointment, Dr. Schierman stated that an appointment with a specialist in infectious diseases, Dr. Zuniga, was pending. In the latter appointment, Dr. Schierman stated that Dr. Zuniga had referred Ms. Morrison to an immunologist. Exhibit 3 at 18 (Aug. 14, 2019) and 19 (Aug. 28, 2019).[6]

Ms. Morrison consulted another doctor, David Amran at Sugar Land Allergy, Asthma & Immunology Center, on September 30, 2019, for "immune issues." Exhibit 4 at 6-7. He ordered labs and diagnosed her with chicken pox with complications.

The results of the lab testing were discussed during an appointment on October 15, 2019 and showed "no abnormalities with her Varicella zoster antibodies." Exhibit 4 at 14. Dr. Amran wondered if chicken pox or allergies were causing her swelling and fatigue. He prescribed Allegra, Zyrtec and Pepcid. Exhibit 4 at 14.

Ms. Morrison returned to Dr. Amran on October 29, 2019. She had increased fatigue, rash, and a fever. Dr. Amran wondered whether the varicella had affected her allergies. He ordered various tests, including a "lupus analyzer." Id. at 17-18.

---

[44] Acyclovir is effective against most known species of human herpesvirus. Dorland's at 24.

[5] Dr. Schierman's records repeat information from one note to the next. Consequently, determining which problems are new is difficult.

[6] It is not readily apparent that Ms. Morrison produced a medical record from Dr. Zuniga as neither her petition nor the Secretary's report refer to this doctor. See also Exhibit 19-2 at 108 (report from a doctor who evaluated Ms. Morrison for the purposes of assigning a disability rating for workers' compensation stating that medical records appeared missing); Exhibit 1 (affidavit) ¶ 11 (asserting that Dr. Zuniga recommended that Ms. Morrison obtain a CT scan for swelling in her left arm).

The tests showed, among other things, a positive anti-nuclear antibody ("ANA") and a positive rheumatoid factor ("RF"). Exhibit 4 at 22.[7] Dr. Amran referred Ms. Morrison to a rheumatologist and a nephrologist. Id. (Nov. 12, 2019).

Ms. Morrison again saw Dr. Schierman on November 15, 2019. Dr. Schierman recorded that Ms. Morrison told him that an "immunologist diagnosed [her] with SLE secondary to immune trigger (Varicella )." Exhibit 3 at 21. The basis for this statement is not readily apparent as Dr. Amran appears not to have diagnosed Ms. Morrison with lupus. See Exhibit 4; see also Resp't's Rep., at 9. Dr. Schierman planned to see Ms. Morrison in January after she saw a rheumatologist. Exhibit 3 at 21.

As Dr. Amran recommended, Ms. Morrison saw a rheumatologist, J. Edward Hernandez, on November 19, 2019. Exhibit 5 at 2. A reason for this visit was Ms. Morrison's positive ANA. Other laboratory tests were negative, including tests for anti-double stranded DNA, Smith antibodies, and Sjogren's antibodies.[8] Dr. Hernandez included lupus as among potential diagnoses along with rheumatoid arthritis and Sjogren's syndrome. He wanted to monitor her for a sub occult connective tissue disease. (In this context, "occult" means "concealed from observation." Dorland's at 1293.)

Ms. Morrison went back to Dr. Amran because of ongoing fatigue, some swelling in the left arm, and facial swelling. Exhibit 4 at 25. Dr. Amran noted that Ms. Morrison had some proteinuria and her IgE was high which could "explain the facial swelling." Id. at 26. Still, he wished to wait for the complete workup from rheumatology and nephrology before deciding a treatment course. Id. Dr. Amran discussed petitioner's case with infectious disease "who was involved with the vaccine development" and concluded that Ms. Morrison's vaccination was "coincidental and not likely as cause and effect." Id.

In the next month, Ms. Morrison complained about more swelling to Dr. Amran. Exhibit 4 at 29 (Jan. 16, 2020). Dr. Amran stated that Ms. Morrison's symptoms were "[u]nlikely to be due to previous Varicella vaccination." Id. at 30. Dr. Amran ordered more laboratory studies.

On January 21, 2020, Ms. Morrison returned to Dr. Hernandez for a follow-up. Exhibit 5 at 6. Her primary complaint was generalized fatigue. Id. She reported transient arthralgias but did not complain of any swelling in any specific joint. Id. Results from laboratory tests showed an elevated ANA at 1:80. However, other tests including dsDNA, SSA, SSB, and Smith, were again negative. Id. In addition, on this set of tests, Ms. Morrison's rheumatoid factor and CCP tests were negative. Id. Ms. Morrison's urinalysis was again unremarkable, with no hematuria or proteinuria. Id. Dr. Hernandez stated that he could not diagnose Ms. Morrison with "a

[7] Antinuclear antibodies are "almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma . . . Sjögren syndrome, and mixed connective tissue disease." Dorland's at 99. Rheumatoid factor antibodies are usually found in people with rheumatoid arthritis but are also found in people with other connective tissue disorders. Id. at 669.

[8] Antibodies against a specific type of double-stranded DNA are "found in the serum of patients with systemic lupus erythematosus." Dorland's at 99.

clinically definable systemic connective tissue disorder." Id. at 8. Instead, he planned to monitor her. He wanted to see her again in "5-6 months."

To refresh, at the end of October, Dr. Amran had referred Ms. Morrison to a nephrologist because she had protein in her urine. The appointment with a nephrologist, Premal P. Joshi, took place on January 30, 2020. In this visit, Ms. Morrison "[felt] fine…denie[d] any specific complaints but occasionally notice[d] flank pain." Id. Ms. Morrison's physical exam was normal. Id. Dr. Joshi concluded the "[e]tiology of [petitioner's] proteinuria [was] unclear at [the] present time." Id. at 7.

### F. Remainder of 2020

In March and April 2020, which was during the Coronavirus pandemic, Dr. Schierman saw Ms. Morrison. The April appointments were by telemedicine. Ms. Morrison reported that her fatigue was continuing. Dr. Schierman did not prescribe any medications. He recommended that she continue to see her other doctors. Exhibit 3 at 23-25.

In May 2020, Ms. Morrison had appointments with Dr. Schierman and Dr. Amran. Exhibit 3 at 26; Exhibit 4 at 72-80. She complained about shortness of breath for which she was prescribed medication. Otherwise, these records appear not relevant to her claim that the varicella vaccine caused her to suffer lupus.

On June 11, 2020, Ms. Morrison saw Dr. Amran. Ms. Morrison reported that her shortness of breath (dyspnea) was helped with a medication, she had vague flank pain that her nephrologist thought was not related to her kidney, and swelling in her left arm. Exhibit 4 at 86. The medical record also states that she came to Dr. Amran for skin testing and "shape," which the Secretary defined as "Submaximal Heart And Pulmonary Evaluation." See Resp't's Rep. at 12. After an examination, one of Dr. Amran's recommendations was for Ms. Morrison to see a rheumatologist because "without any specific autoimmune disease[,] [it's] likely that her symptoms of dyspnea and swelling may be related to IGE mediated pathway despite not being helped with antihistamines, may be a good candidate for Xolair."[9] Exhibit 4 at 87. Dr. Amran wanted her to return in one week or two weeks.

Eight days later, Ms. Morrison returned to Dr. Amran. The relevant part of her history of present illness concerns a possible lupus diagnosis:

> Pt saw [her] rheumatologist on Tuesday, patient reports that she was diagnosed with lupus.
>
> She reports that the rheumatologist prescribed her Hydroxychloroquine.
>
> She has pending CT of joints.

---

[9] "Xolair" is a trademarked name for a medication that decreases allergic reactions by interacting with IgE. It is used to treat asthma and is administered by injection. See Dorland's at 2057 (defining "Xolair") and at 1301 (defining omalizumab).

Exhibit 4 at 90 (June 19, 2020). Consistent with this report, the list of medications includes "HYDROXYCLOROQUINE by mouth for – days." Id.[10]

However, a problem with this history is that there is no evidence that Ms. Morrison saw a rheumatologist between June 11 and June 19. Certainly, the records from the rheumatologist whom she had been seeing, Dr. Hernandez, do not reflect a visit in this time. Moreover, the Secretary pointed out the absence of confirmation of the report about a rheumatologist relatively early in the case. Resp't's Rep., filed Mar. 27, 2024, at 13 n.10.[11] Having been alerted to a gap in the records, Ms. Morrison could have presented a report from a rheumatologist from early June 2020. But, Ms. Morrison did not.

Dr. Amran prescribed various medications, including Xolair, which was pending approval. Dr. Amran also directed Ms. Morrison to follow up with rheumatology as she had recently started Plaquenil. Exhibit 4 at 91.[12]

The report of Plaquenil continues in the June 29, 2020 telemedicine appointment with Dr. Schierman. Exhibit 3 at 29. Ms. Morrison told Dr. Schierman that she had not noticed any improvement on this medication. Dr. Schierman memorialized that the rheumatologist had ordered an "echocardiogram, ophthalmology exam baseline for HCQ therapy." Id. But, again, the rheumatologist's order does not appear in this record.

According to a July 8, 2020 report to Dr. Amran, Ms. Morrison began taking Plaquenil "for the past 8 days" (or about June 30, 2020). Her problems included not feeling well and allergies. Dr. Amran planned to start Xolair soon. He also encouraged Ms. Morrison to follow up with her rheumatologist because she was taking Plaquenil. Exhibit 4 at 94-97.

Medical records from Dr. Schierman from July through September 2020 provided little new information. These medical records do not refer to Plaquenil. See Exhibit 3 at 30-35.

Across the same span of months, Ms. Morrison saw Dr. Amran for Xolair treatments to help her breathing problems. These records memorialize that Ms. Morrison reported she was taking hydroxychloroquine and that she should follow up with her rheumatologist. Exhibit 4 at 100-14.

An appointment at Fort Bend Rheumatology with Heather Woodin, PA-C, took place on September 23, 2020. Near the beginning of this note, Ms. Woodin wrote: "As discussed at her last visit 4 weeks ago, she was to have labs and x-rays to help guide our treatment decisions. She did not receive x-ray orders we mailed to her and did not have labs either." Exhibit 5 at 12. The reference to a visit "4 weeks ago" suggests that Ms. Morrison had another rheumatology visit in August 2020, but there is no record from that date. Similarly, Dr. Hernandez wrote: "She was started on HCQ in 400 mg QD in June 2020. She reports she has seen significant improvement

---

[10] "Hydroxychloroquine sulfate" is used to suppress lupus erythematosus. Dorland's at 870.

[11] This portion of the Secretary's report contains an error in that the Secretary refers to medications that Dr. Hernandez prescribed. However, the appointment on June 19, 2020 was with Dr. Amran.

[12] "Plaquenil" is a trademarked name for hydroxychloroquine. Dorland's at 1434.

in leg pain compared to prior virtual visits." Id. at 13. But, there is no record of a visit from June 2020.[13]

In terms of current complaints, Ms. Woodin memorialized that: "She generally feels fatigued. Otherwise denies new systemic symptoms, specifically no new pulmonary concerns, rashes, or other neurologic issues." Exhibit 5 at 13. For a plan, Ms. Woodin re-ordered laboratory studies. Ms. Woodin determined that "She persists with myalgia and polyarthralgia without criteria met to diagnosis RA/SLE/MCTD." Id.[14] Ms. Woodin continued the hydroxychloroquine.

In the following month, Ms. Morrison told Dr. Amran that she was "experiencing pain in the tips of her right fingers which moved to her left hand." Exhibit 4 at 116 (Oct. 15, 2020). She advised Dr. Amran that she was seeing a rheumatologist for possible diagnosis of rheumatoid arthritis. Id. This report appears inconsistent because Ms. Woodin, as just noted, stated that she did not meet the criteria for rheumatoid arthritis.

In this appointment, Ms. Morrison requested a note from Dr. Amran excusing her from her employer's requirement that she receive a flu vaccination. Exhibit 4 at 116. Dr. Amran wrote: "Pt [patient] is EXCUSED from getting the flu shot due to a PMHX [past medical history] of severe side effects to previous vaccines. Excuse note was given to the pt for work." Id. at 118. Dr. Amran also suggested that the rheumatologist might increase the dose of hydroxychloroquine.

Ms. Morrison returned to Fort Bend Rheumatology on December 30, 2020, for another appointment with Ms. Woodin. The complaint was pain in her ankles and feet. Exhibit 5 at 17. Ms. Woodin recorded that the labs from October 2020 "showed neg[ative] ANA and negative autoimmune subsets." Id. at 18. In the assessment, Ms. Woodin wrote: Ms. Morrison "continues to endorse intermittent joint pain which she [feels is] improved on Plaquenil and will continue this." Id. at 20. Ms. Woodin added: "I have again reviewed that she does not currently have dx [diagnostic] criteria for SLE/RA/MCTD." Id.

Also, during this visit, Ms. Morrison informed Ms. Woodin that she "had varicella vaccine in past few months and is concerned that she is developing 'lupus from the vaccine.'" Exhibit 5 at 18.[15] In response to this concern, Ms. Woodin "asked her to follow up directly with office where vaccine was administered." Id. at 21.

---

[13] Ms. Morrison did not note the September 23, 2020 rheumatology record's references to recent events. See Pet'r's Mot. for Interim Fees, filed Mar. 14, 2024, ¶ 35.

[14] Ms. Morrison's interpretation of this note is that "Dr. Hernandez believed that Petitioner's continued joint pain could be indicative of RA/SLR/MCTD." Pet., filed June 3, 2022, ¶ 28; accord Pet'r's Mot. for Interim Fees, filed Mar. 14, 2024, ¶ 35. The underlying September 23, 2020 record, however, was signed by Heather Woodin, PA-C. Ms. Morrison's interpretation also seems difficult to reconcile with Ms. Woodin's statement that Ms. Morrison was "without" the criteria for SLE.

[15] Contrary to the report about a varicella vaccine in the last few months, Ms. Morrison actually received the varicella vaccine in June 2019, about 18 months earlier.

### G. Records Created after 2020

The parties' detailed summaries of medical records essentially end at this point. See Pet'r's Mot. for Interim Fees at 7-8. The Secretary goes farther, asserting in two paragraphs that Ms. Morrison continued to see different doctors who did not diagnose Ms. Morrison with lupus. Resp't's Resp. at 14-15. In this context, the Secretary notes that on July 21, 2021, an administrative law judge of the division of workers' compensation in the Texas department of insurance determined that her claim for benefits did not extend to include lupus. The administrative law judge stated: "It was unclear from the medical records and Claimant's testimony which doctor diagnosed this condition." Exhibit 19.2 at 7.[16]

After the decision by the administrative law judge, Ms. Morrison continued to see doctors. Most importantly, Ms. Morrison continued to receive care at Fort Bend Rheumatology through February 2023. Exhibit 17 at 47. At her February 2023 visit, Deanna Wallace, PA-C, maintained that Ms. Morrison did not meet the diagnostic criteria for "systemic connective tissue disorder." Id. at 50.

Ms. Morrison switched rheumatologists in May 2024, when she saw Padma Chimata. In Dr. Chimata's medical record, the "past medical history" includes lupus. Ms. Morrison informed Dr. Chimata that she had been treated by Dr. Hernandez "last seen at least 4 years ago." Exhibit 24 at 2. This history is inaccurate because Ms. Morrison continued to receive care at Fort Bend Rheumatology through February 2023, about 15 months ago. After an examination and reviewing records, Dr. Chimata assessed Ms. Morrison with five problems. None of these problems were lupus. Id. at 4. Dr. Chimata ordered laboratory work up and a follow up in 3-4 weeks. Id. at 7. However, there are no additional materials within Exhibit 24.

## II. Procedural History

### A. Activities before Petition was Filed

Ms. Morrison first consulted the law firm that represented her in the Vaccine Program, The Greenwood Law Firm, on June 5, 2020.[17] A relatively early entry (September 2, 2020) shows that a paralegal spoke to Ms. Morrison about issues in her workers' compensation claim.

Over the next months, paralegals collected medical records. At the end of April 2022, JO began reviewing medical records and drafting an affidavit. More than 50 hours have been charged for these combined tasks.[18] Starting at the end of May 2022, JO spent approximately

[16] Ms. Morrison did not have the benefit of an attorney representing her in this proceeding, but she did have assistance from an ombudsman.

[17] Activities of Ms. Morrison's attorneys and their staff through February 21, 2024, are described in the invoice, which was filed as Exhibit 22.

[18] In the future, the attorneys and paralegals should identify which medical records are being reviewed.

nine hours drafting the petition.[19] Some pre-petition time was spent researching lupus. E.g., entries for May 26, 2022; June 2, 2022.

### B. Petition

Ms. Morrison filed her petition on June 3, 2022. Ms. Morrison stated that, after receiving a varicella vaccine on June 3, 2019, she experienced an allergic reaction and was diagnosed with herpes zoster and, later, systemic lupus erythematosus ("SLE"). Pet. at 1. Ms. Morrison claimed that the vaccine was the cause in fact of her allergic reaction, herpes zoster, and SLE, and that the symptoms continued for more than six months. Pet. at 5-6.

With respect to the claim that she suffered from lupus, the petition asserts "Petitioner was diagnosed with SLE." Pet. ¶ 16. The lack of citation to a medical record is noticeably absent as virtually every other paragraph ends with a cite to evidence supporting the assertion. Although the petition (¶ 30) characterizes the December 30, 2020 encounter as a visit with Dr. Hernandez, the petition does not state that the contemporaneous record reflects that Ms. Morrison "does not currently have dx [diagnostic] criteria for SLE/RA/MCTD." Exhibit 5 at 20.

### C. Other Activities during Entitlement Phase

Ms. Morrison filed her medical records over the next 18 months. The case was then reassigned to the undersigned special master on February 7, 2024.

Ms. Morrison requested attorneys' fees and costs on an interim basis. Pet'r's Interim Fees Mot., filed Mar. 14, 2024. The Secretary opposed an award. The Secretary was "not yet satisfied that the statutory requirements for an award of interim attorneys' fees and costs" had been met, specifically questioning whether Ms. Morrison had a reasonable basis for her claim. Interim Fees Resp., filed Mar. 27, 2024, at 5. The Secretary argued that Ms. Morrison had not preponderantly proven that she had SLE or any other autoimmune disease and that she did not meet the six-month severity requirement for varicella. Id. at 5-11.

The Secretary repeated these points in his Rule 4(c) Report, also filed March 27, 2024. The Secretary again argued that Ms. Morrison had not preponderantly proven that she suffers from SLE, noting that although she received various diagnoses and treatments in the months and years following her vaccination, her treating immunologist never diagnosed her with SLE or any other autoimmune condition. Resp't's Rep. at 16-20. The Secretary also contended that Ms. Morrison's Varicella "more likely than not resolved by July of 2019," and therefore she would not satisfy the six-month severity requirement. Id. at 20-21.

Ms. Morrison argued that she had reasonable basis for her claim, highlighting discrepancies in medical records and her treaters' concerns for SLE. Interim Fees Reply, filed Apr. 3, 2024, at 4-8. Ms. Morrison noted that she had not yet had an opportunity to consult with an expert to opine on vaccine causation, SLE, and her changes in health. She asked that she be awarded interim fees and afforded the opportunity to retain an expert. Id. at 9-10.

[19] Given that the petition is approximately six double-spaced pages and largely tracks information presented in Ms. Morrison's affidavit, it is not readily apparent why so much time was spent drafting the petition.

A status conference was held on April 16, 2024. Ms. Morrison stated that she would not be pursuing a claim for varicella, but maintained that she had reasonable basis for her lupus claim, as her symptoms matched the symptoms of SLE and arose within a couple weeks of her vaccination. Further, Ms. Morrison stated that although her treating doctors had not formally diagnosed her with SLE, they expressed concern for SLE and prescribed hydroxychloroquine, which is used to treat SLE. Ms. Morrison also argued that the Workers' Compensation physicians who ruled out SLE and vaccine causation were not qualified to opine on the matter. Finally, Ms. Morrison noted that she had an appointment with a rheumatologist at the end of the month, and that she would determine whether she would continue pursuing her lupus claim after this appointment. See Order, issued April 16, 2024.

On the same day as the status conference (presumably after the status conference), Mr. Greenwood spent 0.4 hours conferring with a "lupus specialist," who was not identified by name, and 0.4 hours corresponding with an unnamed expert "re: varicella/lupus connection."[20] One of these people was David Axelrod, who has sometimes assisted petitioners claiming compensation through the Vaccine Program. See Supp'l Mot., Appendix C at 10 (copy of check to Dr. Axelrod).

Ms. Morrison amended her petition on May 31, 2024, pursuing only a claim that the varicella vaccine caused her to suffer SLE. On June 24, 2024, Mr. Greenwood's office received records from Dr. Chimata's office, reflecting a visit on May 7, 2024. See Exhibit 24. As noted in the summary of medical records, Dr. Chimata did not assess Ms. Morrison as suffering from lupus.

After reviewing Ms. Morrison's records, her expert witness requested additional information from Ms. Morrison's rheumatologist, Dr. Chimata. Pet'r's Status Rep., filed July 22, 2024; see also time entries for July 11, 2024 (indicating that "JJK" drafted questions for Dr. Chimata). Ms. Morrison submitted questions to Dr. Chimata.

After Mr. Greenwood's office did not receive a response from Dr. Chimata, Ms. Morrison requested authority to depose her. Pet'r's Mot., filed Oct. 21, 2024. This motion was granted. Order, issued Oct. 21, 2024. After Dr. Chimata was served with the deposition notice, Dr. Chimata's attorney communicated with Mr. Greenwood. Time entry for Nov. 1, 2024.

In response to the deposition notice from the Greenwood Law Firm, Dr. Chimata prepared a medical summary, dated November 8, 2024. Dr. Chimata concluded that "for now we have insufficient clinical criteria for Systemic Lupus." Exhibit 26, filed Dec. 11, 2024.

Dr. Chimata's opinion that Ms. Morrison did not suffer from lupus was mentioned in Mr. Greenwood's motion to withdraw, filed Dec. 5, 2024 at 2. Eventually, a status conference was held during which Ms. Morrison, Attorney Greenwood, and an attorney representing the Secretary attended. Ms. Morrison expressed that she was unable to find alternate counsel and that she did not want to continue her case pro se. She understood that her case would be dismissed. See Order, issued Mar. 12, 2025.

---

[20] Appendix B to the supplemental motion for attorneys' fees, filed Mar. 11, 2025, presents information about activities of the attorneys starting February 22, 2024.

Mr. Greenwood supplemented the pending motion for an award of attorneys' fees and costs. Pet'r's Supp'l Mot., filed Mar. 11, 2025. This supplemental motion includes an invoice listing activities performed starting February 22, 2024.

The entitlement phase ended when a decision found that she was not entitled to compensation. Decision Denying Entitlement, issued Mar. 14, 2025, 2025 WL 1069272.

### D. Attorneys' Fees Phase

Activities concerning Ms. Morrison's requests for attorneys' fees and costs happened at several times. First, in March and April 2024, Ms. Morrison sought an award of attorneys' fees and costs on an interim basis. The Secretary opposed this award, arguing that Ms. Morrison had not established that reasonable basis supported her claims.

In March 2025, Mr. Greenwood added to the amount requested by submitting an additional timesheet from his law firm as well as a few items of additional costs. Pet'r's Supp'l Mot., filed Mar. 11, 2025. The argument as to why Ms. Morrison's case possessed reasonable basis was contained in approximately two paragraphs. Id. at 14-15. Essentially, Ms. Morrison argued that the case had reasonable basis because Mr. Greenwood investigated it.

These arguments were insufficient and Ms. Morrison was directed to advance more detailed arguments. Order, issued Mar. 12, 2025. The parties complied with this order. Ms. Morrison argued that her case was supported by reasonable basis via a primary brief, filed Mar. 27, 2025, and a reply brief, filed May 1, 2025. In between, the Secretary maintained his opposition. Resp't's Resp., filed Apr. 28, 2025.

The request for attorneys' fees is ready for adjudication.

## III. Standards for Adjudication

The Vaccine Act provides for an award of reasonable attorneys' fees and costs to a petitioner who receives compensation. 42 U.S.C. § 300aa–15(e)(1). When, as here, a petitioner does not receive compensation, a special master may nevertheless award reasonable attorneys' fees and costs if "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Id. The petitioner bears the burden of establishing reasonable basis. McKellar v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 297, 305 (2011).

Good faith and reasonable basis are distinct requirements. Simmons v. Sec'y of Health & Hum. Servs., 875 F.3d 632, 635-36 (Fed. Cir. 2017). Good faith is a subjective inquiry, while reasonable basis is an objective one. Id. at 636. Thus, the reasonable-basis inquiry focuses on objective evidence supporting the claim rather than counsel's conduct in investigating or pursuing it. Id.; Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337, 1344-45 (Fed. Cir. 2020). Here, the Secretary does not challenge Ms. Morrison's good faith. Accordingly, the disputed prerequisite is reasonable basis.

The quantum of evidence necessary to establish reasonable basis is lower than the preponderance of the evidence required to establish entitlement. The Federal Circuit has explained that "more than a mere scintilla but less than a preponderance of proof could provide

sufficient grounds for a special master to find reasonable basis." Cottingham, 971 F.3d at 1346. Medical records, affidavits, and sworn testimony may constitute objective evidence supporting reasonable basis. James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1379-81 (Fed. Cir. 2021). Further, "the absence of an express medical opinion on causation is not necessarily dispositive," particularly during the early stages of a case. Id. at 1379. Nevertheless, because causation is a necessary element of a Vaccine Act claim, a petitioner must point to objective evidence supporting a causal relationship between the vaccination and the alleged injury. Cottingham, 971 F.3d at 1346. And the existence of more than a mere scintilla of evidence does not compel a finding of reasonable basis. Cottingham v. Sec'y of Health & Hum. Servs., 159 Fed. Cl. 328, 336 (2022), aff'd without op., 2023 WL 7545047 (Fed. Cir. 2023).

In evaluating reasonable basis, a special master may consider the same statutory elements that a petitioner ultimately must establish to receive compensation. Cottingham, 971 F.3d at 1345-46. For an off-Table claim, causation is ordinarily analyzed under the three-prong framework established in Althen v. Secretary of Health & Human Services, 418 F.3d 1274 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Id. at 1278. A special master may use these Althen prongs to organize the reasonable-basis analysis. Sheller v. Sec'y of Health & Hum. Servs., 121 F.4th 1301, 1305-07 (Fed. Cir. 2024). However, Sheller cautions against applying the Althen factors rigidly at the reasonable-basis stage because requiring a particular quantum of evidence for every prong could impose a burden greater than the reasonable-basis standard requires. Id. at 1307.

With these principles in mind, the question is not whether Ms. Morrison ultimately could have established entitlement to compensation. Rather, the question is whether the objective evidence provided a reasonable basis for the claim she pursued—that the varicella vaccination caused her to develop SLE. As explained below, the evidence did not provide reasonable basis for that claim.

## IV. Analysis

The Vaccine Act links reasonable basis to what a petitioner is claiming. A "special master . . . may award . . . reasonable attorneys' fees . . . if the special master . . . determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." 42 U.S.C. § 300aa—15(e).

Here, arguably, there is some lack of precision. In the June 3, 2022 petition, Ms. Morrison asserted that the varicella vaccine caused her to develop lupus and chicken pox.[21] Later, the May 31, 2024 amended petition asserted that the varicella vaccine caused Ms. Morrison only to develop lupus.

Whether the reasonable basis analysis should go back to claims asserted in an original petition, but not pursued in an amended petition, is not required to be addressed here. Ms.

[21] Technically, the petition actually alleged "herpes zoster." This terminology is interpreted as intending to mean "varicella zoster."

Morrison's arguments regarding reasonable basis concern her claim for lupus, not chicken pox. See Pet'r's Br., filed Mar. 27, 2025. Because Ms. Morrison ultimately abandoned her separate varicella claim and pursued only the claim that the vaccination caused SLE, it is unnecessary to resolve the parties' dispute concerning whether the earlier varicella illness independently satisfied the Vaccine Act's six-month severity requirement. Thus, arguments regarding lupus will be the only arguments considered.

In support of her contention that reasonable basis supports her claim regarding lupus, Ms. Morrison presents two arguments, which overlap to a degree. The first argument is based upon the evidence. The second argument is based upon her attorneys' conduct. This second argument about how her attorneys represented her connects with the first argument in the sense that (unsurprisingly) Ms. Morrison's attorneys see the evidence as supporting her claim.

**A. Point One: Evaluation of the Evidence**

Two topics affect an analysis of whether reasonable basis supports the amended petition's assertion that the vaccination caused Ms. Morrison to suffer from lupus. These are whether Ms. Morrison suffered from lupus and whether the vaccination caused the lupus. The analysis begins with the question of diagnosis.

1. Diagnosis

As discussed above, special masters may structure an evaluation of reasonable basis around the elements for causation. Before getting to causation, the first question to consider is whether reasonable basis supports the assertion that Ms. Morrison suffered from lupus. A lack of evidence regarding diagnosis has been the foundation for finding that a petitioner's claim lacked reasonable basis. E.g., Pless v. Sec'y of Health & Hum. Servs., No. 16-271V, 2018 WL 6566208 (Fed. Cl. Dec. 13, 2018) (denying motion for review of decision finding lack of reasonable basis); Braun v. Sec'y of Health & Human Servs., No. 17-1571V, 2020 WL 4197309 (Fed. Cl. Spec. Mstr. June 11, 2020) (finding no reasonable basis for a claim where the medical records did not support the alleged encephalopathy); Brieseacher v. Sec'y of Health & Human Servs., No. 18-1616V, 2020 WL 4198628 (Fed. Cl. Spec. Mstr. May 15, 2020) (finding no reasonable basis for a claim involving Guillain-Barré syndrome when many records repeatedly rejected Guillain-Barré syndrome).

Here, for Ms. Morrison, there is not a reasonable basis for asserting that Ms. Morrison suffered from lupus. Ms. Morrison's treating rheumatologist, Dr. Hernandez, determined that she did not fulfill the diagnostic criteria for lupus. Exhibit 5 at 8 (Jan. 21, 2020). Dr. Hernandez reached this conclusion after reviewing laboratory studies that were negative for double-stranded DNA antibodies and negative for Smith antibodies. A later Fort Bend Rheumatology record from December 30, 2020, similarly reflected that Ms. Morrison did not meet the diagnostic criteria for SLE, RA, or MCTD. Heather Woodin, PA-C, made that assessment. Exhibit 5 at 20. As both the January 21, 2020 record and the December 30, 2020 record are contained within Exhibit 5, Mr. Greenwood was aware of them before filing the original petition.

Dr. Hernandez's opinion that Ms. Morrison did not suffer from lupus is strong evidence against Ms. Morrison's claim that she had lupus. Dr. Hernandez continued to monitor Ms. Morrison because a connective tissue disorder can take months or years to fully manifest, yet he

repeatedly found that she did not satisfy the criteria for SLE. Although Dr. Hernandez explained that a connective tissue disorder could take months or years to fully manifest and planned to continue monitoring Ms. Morrison, he did not diagnose her with SLE. Later Fort Bend Rheumatology records likewise continued to reflect insufficient diagnostic criteria. As late as February 2023, Deanna Wallace, PA-C, found Ms. Morrison's symptoms insufficient to diagnose a clinically definable systemic connective tissue disorder. Thus, although her providers continued to monitor her for the possible development of a connective tissue disorder, the contemporaneous rheumatology records did not establish an SLE diagnosis. Additionally, Dr. Hernandez is a rheumatologist, which is the specialty that treats lupus. No treating doctor contradicted Dr. Hernandez's opinion. Thus, Dr. Hernandez is likely to be correct about diagnosis.

Ms. Morrison argues that other evidence nevertheless supplied reasonable basis for an SLE diagnosis. She points to her positive ANA and rheumatoid factor, elevated IgE, and treatment with hydroxychloroquine (Plaquenil). But Dr. Hernandez was aware of Ms. Morrison's positive ANA, rheumatoid factor, and subsequent rheumatologic laboratory findings when he determined that she did not meet the diagnostic criteria for a systemic connective tissue disorder. Fort Bend Rheumatology nevertheless continued hydroxychloroquine while later records likewise reflected that she did not meet the diagnostic criteria for SLE. Later testing also showed a negative ANA and negative autoimmune subsets. Thus, neither the laboratory findings nor the prescription of a medication used to treat lupus outweighs the rheumatology providers' express assessments regarding diagnosis.

Ms. Morrison also relies upon Dr. Joshi's reference to a suspected autoimmune condition. But suspicion of an autoimmune process does not establish that Ms. Morrison suffered from the particular condition alleged in her amended petition, SLE. Dr. Joshi did not diagnose Ms. Morrison with SLE.

The evidence supporting the diagnosis of lupus carries much less value than Dr. Hernandez's opinion. Some doctors memorialize an account in which Ms. Morrison told the doctor that someone had diagnosed her with lupus. E.g., Exhibit 3 at 21 (Nov. 15, 2019 record from Dr. Schierman memorializing that Ms. Morrison told him that an "immunologist diagnosed [her] with SLE secondary to immune trigger (Varicella )"); Exhibit 4 at 90 (June 19, 2020 record memorializing Ms. Morrison's report that a rheumatologist had diagnosed her with lupus).

The basis for these statements is not readily apparent as Dr. Amran appears not to have diagnosed Ms. Morrison with lupus. See Exhibit 4; see also Resp't's Rep., at 9. Likewise, the record does not contain a contemporaneous rheumatology record confirming the reported June 2020 diagnosis. To the contrary, when Ms. Morrison was seen at Fort Bend Rheumatology in September 2020, Ms. Woodin, PA-C, recorded that she continued to experience myalgia and polyarthralgia "without criteria met to diagnosis RA/SLE/MCTD." Exhibit 5 at 13. Likewise, the testimonial assertions contained in petitioner's affidavit carry little weight as they are not corroborated by underlying medical records. See Exhibit 1 ¶ 3, 18, 28, 39.

Ms. Morrison's statement to Dr. Schierman that she was diagnosed with lupus and the other reports of a lupus diagnosis, together with her affidavit, constitute some evidence regarding diagnosis. Arguably, the combined value of these statements could be considered a scintilla of evidence on the topic. But, the production of a scintilla of evidence does not guarantee a finding

of reasonable basis. Cottingham, 159 Fed. Cl. at 336 (2022). The evidence supporting a proposition must be weighed with other evidence, including evidence contrary to the proposition. McCoy v. Sec'y of Health & Hum. Servs., 178 Fed. Cl. 749, 757 (2025). Here, the evidentiary record, considered as a whole, does not weigh in favor of finding that reasonable basis supported the assertion that Ms. Morrison suffered from lupus.

2. Causation

If Ms. Morrison had adequately supported her assertion that she suffered from lupus, the next step would be to determine whether the varicella vaccination caused the lupus. For a causation-in-fact claim, petitioners establish causation by fulfilling the Althen test. In the context of evaluating reasonable basis, the burden of proof on causation is lower than a preponderance of the evidence.

To demonstrate entitlement, petitioners rely upon medical records and medical opinions. 42 U.S.C. § 300aa—13(a). Here, Ms. Morrison did not submit an opinion from a retained expert supporting vaccine causation. Instead, she relies upon one special master's ruling that a vaccine caused lupus. Pet'r's Br. at 7, citing Williams v. Sec'y of Health & Hum. Servs., No. 04-1725V, 2007 WL 2775190 (Fed. Cl. Spec. Mstr. Sep. 11, 2007).[22]

The Secretary attempts to undermine the value of Williams. He points out that in about five cases decided after Williams, special masters have not granted entitlement for cases involving various vaccines causing lupus. Resp't's Resp. at 15. The Secretary further attempts to distinguish Williams because in Williams, the diagnosis of lupus was not disputed and petitioner in Williams presented an expert's opinion. Id. at 15-16. In addition, Williams involved the hepatitis B vaccine rather than the varicella vaccine and proceeded on a materially different factual and causation record.

How one ruling from a special master should affect the analysis of reasonable basis presents an interesting question. See Mazzone v. Sec'y of Health & Hum. Servs., 22-1891V, 2026 WL 2123799, at *9 (Fed. Cl. Spec. Mstr. June 25, 2026) (discussing the background to Sheller). At best, the non-binding precedent could provide a future petitioner, like Ms. Morrison, with some support for the first Althen prong and perhaps a part of the third Althen prong.

If it were assumed for the sake of argument that Williams supplies a reasonable basis for Ms. Morrison's assertion that a vaccine can cause lupus, Williams does not assist Ms. Morrison with showing that her varicella vaccine caused her (assumed) lupus. The evidence specific to Ms. Morrison does not supply that missing connection. Although Dr. Amran initially wondered whether the varicella vaccine had affected Ms. Morrison's allergies, after discussing her case with an infectious disease physician involved in vaccine development, he concluded that the vaccination was "coincidental and not likely as cause and effect." Exhibit 4 at 26. In January 2020, Dr. Amran again stated that Ms. Morrison's symptoms were "[u]nlikely to be due to

[22] Ms. Morrison also cites several cases in which the parties settled cases in which petitioners claimed a vaccine caused them to suffer lupus. Pet'r's Br. at 8-9. However, settlement of cases does not confer reasonable basis. Carter v. Sec'y of Health & Hum. Servs., 132 Fed. Cl. 372, 382 (2017); Woods v. Sec'y of Health & Hum. Servs., 105 Fed. Cl. 148, 152-53 (2012). Accordingly, those settlements provide little assistance in determining whether objective evidence supported Ms. Morrison's particular claim.

previous Varicella vaccination." Id. at 30. Thus, Ms. Morrison's post-vaccination symptoms and laboratory abnormalities do not, without more, provide objective evidence of a logical sequence connecting the varicella vaccination to SLE.

For example, to establish compensation, Ms. Morrison would be required to show with preponderant evidence that her condition arose within a time for which an inference of causation is appropriate. Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347 (Fed. Cir. 2008). Here, Ms. Morrison argues that two weeks is an appropriate temporal interval. Pet'r's Br. at 6. But, what symptoms developed within two weeks of the June 3, 2019 varicella vaccine? Although the answer to this question is not contained in Ms. Morrison's March 27, 2025 brief, some information can be gleaned from Ms. Morrison's March 14, 2024 motion for an award of interim fees. In that motion, Ms. Morrison suggested that within about two weeks of the vaccination, she developed rashes, fatigue, and full-body aches. Pet'r's Mot. for Interim Fees at 3-4. Ms. Morrison has not presented any minimally persuasive evidence that suggests these symptoms are associated with lupus, as opposed to chicken pox. Her reliance on information concerning how quickly the varicella vaccine becomes effective and the duration of the immunity it produces does not fill this gap. Those materials do not address the medically appropriate interval for the development of vaccine-caused SLE.

Accordingly, even if it were assumed that Ms. Morrison suffered from lupus and if Williams could grant Ms. Morrison some value on Althen prong one, Ms. Morrison still has a reasonable basis problem for Althen prong three. Even under a standard lower than preponderance of evidence standard, Ms. Morrison has not shown that her (assumed) lupus began within a time for which an inference of causation is appropriate.

Ms. Morrison also cites cases in which unsuccessful petitioners were nevertheless found to possess reasonable basis. See Pet'r's Br. at 10-11, citing Harris v. Sec'y of Health & Hum. Servs., No. 10-322V, 2015 WL 2129036 (Fed. Cl. Spec. Mstr. Apr. 14, 2015); Shapiro v. Sec'y of Health & Hum. Servs., No. 99-552V, 2013 WL 6665128 (Fed. Cl. Spec. Mstr. Nov. 19, 2013); Miceli v. Sec'y of Health & Hum. Servs., No. 10-131V, 2016 WL 6892559 (Fed. Cl. Spec. Mstr. Oct. 27, 2016). Those cases establish the unremarkable proposition that failure to prove entitlement does not necessarily mean that a claim lacked reasonable basis. They do not establish that Ms. Morrison's claim possessed reasonable basis. Unlike this case, those cases involved objective medical evidence supporting the injury or causation alleged by the petitioner. Reasonable basis remains a case-specific inquiry based upon the objective evidence supporting the particular claim.

For these reasons, Ms. Morrison has failed to establish that reasonable basis supported the claim that the varicella vaccine caused her to suffer lupus. The lack of evidentiary support runs throughout the case: beginning, middle, and end. Without a reasonable basis, Ms. Morrison is not eligible for a discretionary award of attorneys' fees and costs. Because reasonable basis was lacking when the petition was filed, the Secretary's alternative argument that reasonable basis was subsequently lost need not be addressed.

### B. Analysis Part Two: Attorney Conduct

In a motion Mr. Greenwood signed, Ms. Morrison asserted that "Reasonable basis existed in this case because Petitioner's counsel did his due diligence prior to filing the claim and further

believed there was reason to pursue the claim when he hired an expert witness to assess whether the vaccine caused Petitioner to suffer from SLE." Pet'r's Supp. Mot. at 14-15. This argument is not persuasive in two respects.

Preliminarily, counsel's conduct is generally not relevant to determining whether reasonable basis supports the claim set forth in the petition. Simmons, 875 F.3d at 636. If reasonable basis could be satisfied with a statement from petitioner's attorney that the attorney thought the case was meritorious, then the reasonable basis test would be meaningless. What attorney would say that the case lacked value?

Secondarily, Mr. Greenwood's diligence seems questionable. As noted above, Mr. Greenwood possessed a medical record from Ms. Morrison's treating rheumatologist and additional records from the same rheumatology practice that contradicted his client's account that she suffered from lupus. In this circumstance, Mr. Greenwood and Ms. Morrison would have been well served to investigate whether she suffered from lupus before Mr. Greenwood submitted a petition asserting she suffered from lupus. See Pet. ¶ 16.[23] Mr. Greenwood's investigation appears relatively limited.[24] Before the petition was filed, he spent about three hours looking into lupus symptoms and Ms. Morrison's medical records. Entry for May 26, 2022. The results of this research are not readily apparent as Ms. Morrison did not file any medical literature. To the extent that Mr. Greenwood's research grounded Mr. Greenwood's view that Ms. Morrison suffered from lupus, a view that is contrary to the diagnosis of her treating rheumatologist, Mr. Greenwood could have consulted with an expert. After all, to overcome the presumed accuracy of a treater's opinion regarding diagnosis, Ms. Morrison would be required to present a report from an expert, not just an argument from her attorney. But, before the petition was filed, the timesheets do not memorialize any consultation with a medical expert.

Ultimately, Mr. Greenwood diligence---or the lack thereof---has little influence on the reasonable basis analysis. Instead, the decisive question is whether objective evidence provides a reasonable basis for the claim asserted in Ms. Morrison's petition. Here, the evidence is lacking. When the evidence is insufficient, a denial of attorneys' fees and costs is consistent with the policies underlying the Vaccine Program. See Cottingham v. Sec'y of Health & Hum. Servs., No. 15-1291V, 2021 WL 6881248, at *24-26 (Fed. Cl. Spec. Mstr. Sep. 27, 2021), mot. for rev. denied, 159 Fed. Cl. 328 (2022), aff'd without op., 2023 WL 7545047 (Fed. Cir. 2023).

## V. **Conclusion**

After Ms. Morrison did not receive compensation on her claim that a varicella vaccination caused her to suffer lupus, she requested an award of her reasonable attorneys' fees and costs. The Secretary opposed it. After the Secretary's opposition, Ms. Morrison did not

---

[23] The analysis in the text is based upon the rheumatology records in Mr. Greenwood's possession, including Dr. Hernandez's January 21, 2020 record, which Mr. Greenwood cited in the petition. It bears noting that before Mr. Greenwood filed the petition, Ms. Morrison's claim regarding lupus was rejected by an administrative law judge. See Exhibit 19.2 at 7. Before filing the petition, Mr. Greenwood could have inquired about the status of the workers' compensation claim.

[24] Paralegals collected medical records and an attorney spent a great deal of time summarizing the medical records.

demonstrate with sufficient evidence that reasonable basis supported her claim. Thus, Ms. Morrison is not eligible to receive an award of attorneys' fees and costs. Her motion for interim fees, filed Mar. 14, 2024, and her motion for supplemental fees, filed Mar. 11, 2025, are DENIED.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

IT IS SO ORDERED.

s/Christian J. Moran
Christian J. Moran
Special Master